824

**KEAN v. WHEELAN. \***

Patent Appeals No. 4072.

Court of Customs and Patent Appeals.

March 6, 1939.

Frederic P. Warfield, of New York City (N. R. French, of New York City, of counsel), for appellant.

\*Rehearing denied May 1, 1939.

Watson, Bristol, Johnson & Leavenworth, of New York City (Lawrence Bristol and Norman N. Schuttler, both of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority to the party Wheelan on three counts of an interference declared between applications for patents relating to photographic apparatus designed, according to statements in the briefs for both parties, to overcome camera shyness on the part of a person being photographed.

The counts read as follows:

"1. In photographic apparatus permitting a person to be photographed with the camera hidden from view and permitting the said person to observe by mirror means his pose as seen from the camera, the combination comprising a camera and means for screening the camera from view to prevent the person being photographed from seeing the camera or parts thereof which would otherwise render or have a tendency to render the person camera-conscious, the said means including a light-transmitting screen having a reflecting material forming a partly-transparent mirror, the said screen being positioned between the person to be photographed and the camera lens and having sufficient area to permit the person to observe his image.

"2. In photographic apparatus permitting a person to be photographed with the camera hidden from view and permitting said person to observe by mirror means his pose to be photographed by the camera, the combination comprising a camera and partially-reflecting mirror means having a reflecting metal deposited thereon and positioned in the path of the light which is to give rise to the picture, said metal being disposed over a portion of the surface of said mirror means, said portion being of sufficient size to permit an image reflected from said metal to be clearly visible at a substantial distance therefrom, said mirror means being adapted to transmit a greater amount of light than it reflects, said mirror means being so oriented that said metal does not reflect into said picture-taking means light · which passes

from the sitter to said metal, the surface of said mirror means being substantially perpendicular to the light path.

"3. In photographic apparatus permitting a person to be photographed with the camera hidden from view and permitting the said person to observe by mirror means his pose to be photographed, the combination comprising a camera, means for screening the camera from view to prevent the person being photographed from seeing the camera or parts thereof which would otherwise render or have a tendency to render the person camera-conscious, the said means including a rotatably mounted light-transmitting screen having a reflecting material distributed so as to form a partly-transparent mirror, the said screen being positioned between the person to be photographed and the camera lens and having a sufficient area to permit the person to observe his image therein and a plurality of mirrors positioned out of the path of light from said person to the said camera but to one side thereof so as to permit said person to view the said partly-transparent mirror therein thereby permitting a profile or partly profile view to be seen by said person in one of said plurality of mirrors."

A brief but comprehensive description of the invention is stated by the Examiner of Interferences as follows: "The subject matter of the interference relates to a photographic apparatus designed to permit a person to be photographed with a camera hidden from view and at the same time permitting the person photographed to observe his pose in a mirror. This result is accomplished by placing a transparent mirror between the subject and the camera lens thereby allowing the subject to see his reflection in the mirror while at the same time the subject is photographed through the transparent mirror. To permit profiles and semi-profiles the transparent mirror is rotatably mounted and side mirrors permit the subject to view his reflected profile in the transparent mirror."

The application of Kean was filed October 16, 1933, and he now relies on this date for reduction to practice. The application of Wheelan was filed March 28, 1935. The Examiner of Interferences awarded Wheelan conception "as early as December 31, 1927," and reduction to practice "at least as early as June, 1931." He found that Kean conceived the invention in November 1922 but that he failed to es-

tablish diligence from just prior to Wheelan's conception date until the filing of his (Kean's) application.

The board affirmed the Examiner of Interferences upon all points.

Both parties took testimony much of which was directed to efforts by both parties to establish earlier dates for reduction to practice than those finally awarded. As the case was presented to us, however, no review of that part of the record need be given here. The entire record is quite fully and succinctly reviewed in the decision of the Examiner of Interferences.

Kean does not contend that he has shown diligence during the critical period defined by the Examiner of Interferences. His contention is that there was no burden on him to show diligence because he alleges Wheelan did not establish reduction to practice prior to Kean's filing date.

So, the only issue to be determined here is whether Wheelan did reduce to practice as found by the tribunals of the Patent Office—that is in June 1931. There was some contention on the part of counsel for Wheelan before us that he was in fact entitled to an earlier date than that awarded him but we do not find it necessary to determine as to that.

The brief on behalf of Kean discusses each count separately, evidently for the purpose of emphasizing certain limitations, particularly limitations in counts 2 and 3, which will be referred to later.

The record embraces as exhibits a very large number of pictures taken by Wheelan in various of his experiments. Many of these are alluded to in the decision of the Examiner of Interferences and rejected as not constituting reduction to practice, it being pointed out that notations made by Wheelan on the backs of many of the pictures showed that he himself considered them as poor. The first pictures deemed by the Examiner of Interferences to meet the requisite test were discussed by him as follows:

"In June, 1931, Wheelan used a still faster film known as panchromatic and took the pictures of exhibits 12A, 12B, and 12D of Eva McCoy (nee Kowal). The taking of these pictures is corroborated by McCoy (Kowal) who remembers that the pictures were taken right after her birthday (June 5) in 1931 * * *. She recalls that the year was 1931 by the fact that it was about six months before she

was married and the fact that the studios had a big opening in Marshall Field Studio in Chicago * * *.

"These pictures are the first taken through the transparent mirror that are of sufficient quality to constitute a reduction to practice, as well as the first that Wheelan considered of good quality as borne out by his notations on the backs thereof as compared with his notations on previous pictures.

"For example such notations as:

" 'The skin texture is *wonderful,* even if the eyes are too black. If I can get the eye value of super and the speed of pan everything will be O. K.' * * *

" 'I wouldn't want a better picture at any price. Pan is simply sufficiently faster to let enough light through the mirror at a reasonable exposure' * * *.

" 'She says eyes look too dark but at last I approach quality right through the mirror. Fine enough for a sample anywhere' * * *.

"Only two things in the pictures taken with panchromatic film were considered a detriment by Wheelan. First, that light color eyes had a tendency to appear too dark in the picture and second that the film being very sensitive to the full range of light radiations must necessarily be loaded into the holders in absolute darkness.

"The fact that light eyes appeared darker while in some cases might be a slight disadvantage in other cases might even be of some slight advantage since women sometimes like their eyes to appear darker.

"As to the fact that the film must be necessarily loaded in absolute darkness this was only a detriment due to the fact that Wheelan did not trust his photographers to follow instructions having learned from experience that even simple directions were sometimes disregarded. A careful person skilled in the art would, however, handle the film in accordance with its requirements and no trouble on this score would be experienced."

In the brief for Kean attention is directed to the fact that the first commercial use of a Wheelan apparatus occurred in November 1934, which was some four months prior to the filing of Wheelan's application, and certain evidence is referred to as indicating that Wheelan was not satisfied with the results obtained in June 1931 and continued to experiment.

The evidence so referred to includes testimony given by a Mrs. Robert Erwin (nee Levorsen), who was in Wheelan's employ, to the effect that Wheelan continued work on the device "Until it was perfected in 1934," explaining that by "perfected" she meant the *camera* then brought out was "marketable."

The brief then says: "The Examiner's test of reduction to practice was, as heretofore noted, "a picture which is of sufficiently good quality to be accepted by a purchaser." When the Examiner and Board say these June, 1931, photographs attained such quality, they do so in the face of Mrs. Erwin's (Levorsen) testimony that Wheelan's photographs only attained marketable quality in November, 1934. They have substituted their opinion for that of Wheelan's chief woman employee. The issue is not one of aesthetics but of marketability."

The illogic of the foregoing argument is apparent. The lady said nothing of the "marketable quality" of photographs; she spoke of the marketability of a camera—not the marketing of pictures made with the camera. The Examiner of Interferences had no occasion to concern himself with "marketability" of either the camera or pictures made by use of the camera. In connection with his holding that certain experiments made by Wheelan in 1927 did not constitute reduction to practice he said: "To establish a reduction to practice the utility of the invention must be demonstrated and it is certainly not useful unless a picture which is of sufficiently good quality to be accepted by a purchaser is produced."

The Examiner of Interferences did not hold that a purchaser *had* to accept a photograph; he merely held that the pictures made in June 1931 were "of sufficient quality to constitute a reduction to practice" when measured by the rule announced in connection with pictures previously made which were not deemed of sufficient quality.

The foregoing issue evidently was presented to the board along the same line that it has been presented here. The board said:

"Kean relies on the testimony of Mrs. Erwin, Wheelan's chief woman employee to establish that Wheelan's device was not marketable until November 1934.

"We do not understand the law of reduction to be that the machine must be

perfected in a commercial sense. (Sydeman v. Thoma, 32 App.D.C. 362). The examiner has held Exhibits 12A, 12B and 12D as evidence of successful reduction to practice but Kean contends that this holding is arbitrary in view of Wheelan's testimony regarding the darkness of the eyes. We agree with the examiner that the photographs are sufficient to establish reduction to practice of the apparatus of count 1."

In our opinion there is no error of law in the foregoing, and, if the photographs made in June 1931 were made with apparatus which responds to the counts, there should be no reversal of the board's decision.

Counsel for appellant stresses certain structural features which he argues were not shown to have been present in the apparatus used by appellee in the latter's June 1931 activities. One of these common to all the counts is a "camera hidden from view." The gist of the argument respecting this feature is to the effect that certain evidence shows that appellee's commercial device, not put into use until November 1934, does not show a camera "concealed as the counts call for," and it is urged that if the camera is not concealed in the commercial device "it is certain that it was no better concealed during the early experiment * * *."

Obviously, we are not here interested in the showing made in appellee's commercial device and express no opinion with respect to it. The matter of importance relates to the means used in the alleged reduction to practice. It is our view that the evidence cited by the Examiner of Interferences is quite sufficient to establish the use of a hidden camera at that time.

A second feature relates to the character of mirror required. As we understand this feature, the mirror device must have a portion of its surface treated with a reflecting metal or material, so that such portion will reflect the image of the subject being photographed, and have another portion which is transparent through which the picture may be taken by the lens. Further, we understand that the reflective or coated portion serves as a screen which conceals the camera from the view of the subject. Appellant disclosed for this feature a mirror which the brief on his behalf refers to as a "scored" mirror. From the specification it appears that the "scoring" may be accomplished by removing portions of the reflecting metal or by failing to coat parts of the mirror so that transparent lines or spaces are left through which light will pass, and it is the contention of counsel for appellant that only a "scored" mirror meets the requirement of the counts, particularly count 2, with respect to which it is pointed out that it originated with Kean, and the argument is made that, therefore, it must be interpreted in the light of his specification. The counts do not use the word "scored," nor does the Kean specification use it. Specifically the limitation relating to the reflecting metal as expressed in count 2 reads, "said metal being disposed over a portion of the surface of said mirror means, said portion being of sufficient size to permit an image reflected from said metal to be clearly visible at a substantial distance therefrom."

It seems to us that appellant seeks to have us read into count 2 limitations which he himself failed to insert. It is our supposition that the disclosure of Kean supports the count even though it be broader as expressed than it would be if limited by use in it of the word "scored." We are, of course, not at liberty to disregard express limitations in a count of an interference, while giving it the broadest construction reasonable, but, on the other hand, we are not at liberty to read limitations not expressed into limitations which are expressed. Without discussing in detail other limitations in count 2, supra, upon which the brief for appellant makes some comment, we deem it sufficient to say that we do not agree with counsel for appellant that the tribunals of the Patent Office have unduly broadened the count. Upon the contrary, it seems to us that appellant seeks to have it unduly limited by construction. There is a suggestion that under the board's construction the count might not be patentable over prior art. Patentability is not at issue in this proceeding.

As to counts 1 and 2, therefore, we find ourselves in harmony with the holdings of the tribunals of the Patent Office.

Count 3, however, contains one limitation concerning which we feel constrained to differ. This count requires that there shall be included in the means for screening the camera from view a "rotatably-mounted light-transmitting screen." (Italics ours.) As has been indicated we understand this screen to be formed by the reflecting material or coating upon a portion

828

of the mirror. Hence, for such portion to be rotatably mounted the mirror itself must be so mounted. So far as we can determine from the record, the only mounting for the coated mirror shown to have been used by Wheelan in his activities prior to Kean's filing date consisted of a "little slotted base," the use of which Wheelan, in his testimony, described as follows: "I held this mirror upright by putting it in a little slotted base for the purpose of holding it so it wouldn't fall forward or backward."

He placed the device so arranged "on a soap box used as a pedestal." Obviously, whatever rotating of the mirror took place was the result of moving the slotted base by hand.

Both the Examiner of Interferences and the board, pointing out that pivotal mounting is not required, were of the opinion that the arrangement described was sufficient to support the count.

While the issue may be (as it seems to us to be) quite narrow, and perhaps of little practical importance in a patentable sense, we nevertheless are unable to concur in the holding that "rotatably-mounted" is met by such arrangement, and since this is a clearly defined limitation of count 3, we must disagree upon this point.

The decision of the board is reversed as to count 3, and affirmed as to counts 1 and 2.